**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* [UNDER SEAL], | **UNDER SEAL** |
| Plaintiffs, | *Qui tam action filed in camera and under seal in accordance with 31 U.S.C. § 3730(b)(2)* |
| v. | |
| [UNDER SEAL], | |
| Defendants. | |
| | Civil Action No. |

FILED IN CLERK'S OFFICE

**COMPLAINT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* JOHN BERTUCCI and LOWELL WARNER, | **UNDER SEAL** |
| Plaintiffs, | *Qui tam action filed in camera and under seal in accordance with 31 U.S.C. § 3730(b)(2)* |
| v. | |
| ZYNO MEDICAL, LLC, ZYNO SOLUTIONS, LLC, INFUTRONIX, LLC, INFUTRONIX SOLUTIONS, LLC, ZYNO ELECTRIC & MACHINERY, LTD., and CARE EVERYWHERE LLC, | Civil Action No. |
| Defendants. | |

**COMPLAINT**

**TABLE OF CONTENTS**

I.  INTRODUCTION......................................................................................1

II.  JURISDICTION & VENUE............................................................4

III.  PARTIES..............................................................................................4

IV.  LEGAL BACKGROUND.....................................................................8

    A.  The False Claims Act.................................................................8
    B.  Medicare Coverage for Infusion Drug Treatment.....................10
    C.  Medicare Reimbursement for Infusion Drug Treatment.............11
    D.  Medicare Coverage and Reimbursement for Chemotherapy Drugs...............12

V.  FACTUAL BACKGROUND – BEFORE THE FDA AUDIT.............................13

    A.  Defendants Were Aware By 2015 That Their Infusion Administration Sets Were Defective And Leaked Critical Drugs During Treatment...........................13
    B.  Defendants Took Action To Conceal These Defects From Physicians, Patients, And The Government .......................................................16
    C.  Defendants Finally Initiated A Recall In July 2016.................17

VI.  THE FDA AUDITED ZYNO AND ISSUED IT A WARNING LETTER...............18

VII.  ZYNO'S FRAUDULENT ACTS DURING AND AFTER THE FDA AUDIT.........20

    A.  Defendants Falsified Documents During The FDA Audit.........................20
    B.  Defendants Continue To Manufacture And Distribute Defective Infusion Pumps And Administration Sets, Including Nimbus Pumps And Sets, And Use New Corporate Entities As A Shield Against Liability...................22
    C.  Specific Providers To Which Zyno Sold Defective Infusion Pumps And Administration Sets.............................................................25
    D.  Defendants' Fraud Has Caused The Submission Of False Claims To Medicare.....................................................................26

VIII.  COUNTS................................................................................28

1.     Plaintiff-relators John Bertucci and Lowell Warner (together, "Relators")

bring this action on behalf of the United States of America against Zyno Medical, LLC,

Zyno Solutions, LLC, Infutronix, LLC, Infutronix Solutions, LLC, Zyno Electric &

Machinery, Ltd., and Care Everywhere, LLC (together, "Zyno" or the "Defendants") for

violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"), to

recover all damages, civil penalties and all other recoveries provided for under this

statute.

## I.     INTRODUCTION

2.     Zyno manufactures and distributes infusion pumps and administration sets

that deliver medications, including chemotherapy drugs, to patients intravenously. Since

2015, Zyno was aware that its pumps and administration sets were defective and resulted

in substantial leakage of drugs during infusion treatments. This defect jeopardized the

effective administration of chemotherapy in multiple respects. It caused patients to

receive less than the full dose of their necessary drug. Also, when the leakage was

recognized, the defect caused physicians, nurses and/or patients to increase the time

required for the infusion treatment and the volume of a drug needed for that particular

infusion treatment. It also caused some cancer patients not to receive their drug at all.

The majority of patients being treated by providers utilizing Zyno pumps are covered by

Medicare. Accordingly, this defect has directly and foreseeably caused the submission of

false claims for reimbursement because: 1) the Zyno pumps and administration sets were

defective; 2) the infusion services utilizing these leaky Zyno devices therefore could not

properly provide the indicated treatment or administer the correct drug volume; and 3)

1

longer and more infusion services were required than would otherwise be medically necessary had the Zyno devices functioned properly.

3. Knowing full well of this serious defect, Zyno took steps to hide the full extent of problems with its infusion pumps and administration sets from providers, patients, and the federal government. The Food & Drug Administration ("FDA") has express and clear requirements that manufacturers of durable medical equipment ("DME") such as infusion pumps promptly notify both the FDA and users of serious defects in DME products through the submission of Medical Device Reports ("MDRs"). In violation of these requirements, Zyno materially delayed making public disclosure of these defects and instead attempted to appease individual provider customers by offering to replace defective administration sets. This deceptive course of action is referred to as a "silent recall" and is illegal because of the obvious threat it poses to all the users of defective products – providers and patients - who have not noticed or taken affirmative action to redress the specific defects that the manufacturer is trying to conceal from public view.

4. After originally getting FDA approval for its pumps, and in recognition of the severity of ongoing widespread operational defects, Zyno had altered the pumps' software as a corrective measure. However, it concealed these alterations from the FDA to avoid having to resubmit the altered pump for FDA approval as to safety and effectiveness as is required under governing FDA regulations. But Zyno could not conceal the seriousness of its product defects forever, and in July 2016 it finally issued a formal recall of certain infusion pump administration sets due to defects that caused substantial leakage. The FDA shortly thereafter initiated an audit of Zyno's

2

manufacturing processes. This FDA audit identified numerous violations that it determined rendered Zyno's infusion pumps "adulterated" and "misbranded" in violation of federal law and FDA regulations.

5.     Rather than acknowledge that it had been engaged in manufacturing and distributing defective infusion pumps and administration sets for months in violation of federal law, and had then undertaken to correct these defects, (thereby requiring that Zyno submit its altered pumps to another FDA review), Zyno during and after the FDA audit continued its pattern of concealment and deceit. During the course of the FDA audit, Zyno backdated company documents to hide the dates on which it made material alterations to the software included in the pumps in an effort to keep the FDA in the dark. Specifically, it backdated such documents in order to prevent the FDA from recognizing that Zyno had failed to submit new 510(k) applications (as required) and obtain FDA approval before making this material change and releasing the pumps into the market. Unaware that Zyno had falsified documents, that Zyno had been embroiled in an ongoing pattern of deceit and that its infusion pumps suffered from widespread problems with infusion administration set leakage, the FDA eventually closed its audit, terminated Zyno's recall, and continued to approve Zyno's infusion pumps and administration sets for marketing and sale in the United States.

6.     Zyno has failed to correct the manufacturing defects that cause its infusion administration sets to leak critical drugs. Instead, it continues to manufacture and sell these defective products, knowing full well that it is thereby causing physicians and/or outpatient facilities such as outpatient cancer centers to bill Medicare for equipment and services that do not satisfy the legal and medical requirements for reimbursement. In

3

doing so, they also put cancer patients' health at severe risk by selling to providers malfunctioning infusion pumps and administration sets which, among other defects, fail to deliver the intended volume of critical drugs prescribed to fight cancer.

## II.     JURISDICTION & VENUE

7.     Jurisdiction is founded upon the FCA, 31 U.S.C. § 3732(a) and also 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over Zyno because it transacts business in this District and is engaging in the alleged illegal activities and practices in this District.

8.     Venue in the District of Massachusetts is appropriate under 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District.

## III.     PARTIES

9.     The United States is the real party in interest to the claims in this action. Through the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), the United States administers the Medicare and Medicaid programs.

10.     Relator John Bertucci began employment with Zyno on or about August 3, 2015 as a Territory Manager. In 2016, he set a company record of IV Pump sales for a first year Territory Manager with over 650 pumps sold. Relator Bertucci was terminated by Zyno on August 16, 2018 to avoid paying him a considerable amount of commissions that he had earned over the course of many months, and also in retaliation for discussing with Human Resources Director Jill Sullivan Zyno's defective administration sets used with its Ambulatory Nimbus Pump.

4

11.     Relator Lowell Warner began employment with Zyno on October 16, 2013 as a Territory Manager. Mr. Warner was promoted on April 7, 2014 to Vice President-Sales. Mr. Warner resigned from Zyno on February 2, 2018.

12.     Defendant Zyno Medical, LLC, is a Delaware limited liability company with its business address at 177 Pine Street, Natick, MA, 01760. Zyno Medical, LLC, designs and manufactures infusion pumps and administration sets.

13.     Defendant Zyno Solutions, LLC, is a Delaware limited liability company with its business address at 177 Pine Street, Natick, MA, 01760.

14.     Defendant Infutronix, LLC, is a Delaware limited liability company that according to its website is "an innovative medical device company delivering industry leading technology for infusion therapy." Infutronix, LLC, is headquartered at 177 Pine Street, Natick, MA, 01760. *See* Infutronix Website at https://infutronix.com/About.html.

15.     Defendant Infutronix Solutions, LLC, is a Delaware limited liability company that according to its press release is a "distributor and developer of ambulatory infusion pumps." *See* Press Release, "InfuTronix Solutions' Ambulatory Infusion Systems Assigned HCPCS Codes," Business Wire (Apr. 19, 2018), available at https://www.businesswire.com/news/home/20180419005126/en/InfuTronix-Solutions%E2%80%99-Ambulatory-Infusion-Systems-Assigned-HCPCS. Its business address is 177 Pine Street, Natick, MA, 01760.

16.     Defendant Zyno Electric & Machinery, Ltd., is a Chinese company located at No. 99 Shen Mei Rd., Building 4A, 3rd Floor, Shanghai, China, 201318. Zyno Electric & Machinery, Ltd., is the primary manufacturer of Zyno infusion pumps.

5

17. Defendant Care Everywhere, LLC, is a Delaware limited liability company that according to its website is a "software medical device company focused on integrating point-of-care medical devices such as infusion pumps and vital sign monitors with hospital information systems to improve patient safety, nursing productivity, and documentation," with its business address at 177 Pine Street, Natick, MA, 01760. *See* Care Everywhere Website at https://www.careeverywhere.com/about.

18. Zyno's infusion products generally consist of a "pump" that is used with replaceable "administration sets." Patients will typically use 9-30 administration sets each month with the Z800 series pump. Pictures of Zyno's 800F pump and an associated administration set are below.[1]



---

[1] Except where otherwise indicated, this Complaint refers to both the "pump" and associated "administration sets" collectively as a "pump."

### B2/BX Primary Administration Sets

B2/BX Primary Administration Sets are single-use sets for use with Zyno Medical Z-800F, Z-800W and Z-800WF Infusion pumps. All B2/BX Primary administration set fluid paths are sterile, non-Pyrogenic, are not made with natural rubber latex, and are not made with DEHP.

| Product # | Description | Length | # of Y-Sites | Qty |
|---|---|---|---|---|
| B2-70070 or BX-70070 | (1)-Spike tip protector, (2)-Universal spike, (3)-Drip chamber, (4)-Pinch clamp, (5)-Roller clamp, (6)-Male Luer lock adaptor, (7)-Luer lock tip protector. Priming Volume: 18 mL (approx.)/ Drop Size: 20 drops/mL | 105" (266cm) | 0 | 50 |

19.    Chemotherapy patients who use the Nimbus pump will typically use 4-8 administration sets per month.[2]  Pictures of Zyno's Nimbus Flex ambulatory pump and associated administration set are below:



---

[2] On or about May 29, 2019 the company initiated a recall which was created on July 23, 2019 by the FDA.  This was a result of a complaint lodged by customer Lake Health University Hospital Seidman Cancer Center. Absent this complaint, the recall would not have been initiated. Zyno continues to have problems with the Nimbus pump's functionality and administration set leakage today.

## Nimbus™ II Flex Administration Sets

The Nimbus™ Administration Set is designed to administer fluids/medication from a container to a patient through a needle or catheter. The Nimbus Administration Set is a sterilized single use d evice. The fluid path is sterile (EtO sterilized), non-pyrogenic, not made of DEHP, not made with natural latex.

| Product # | Description | Length | # of Y-Sites | Qty |
|---|---|---|---|---|
| IT1032 | HS-004 (1)- Tip protector, (2)-spike cap, (3)-cassette, (4)-anti-free-flow clamp, (5)-1.2 micron air eliminating filter, (6)-slide clamp, (7)-backcheck valve, (8)-Male Luer lock adaptor, (9)-luer cap. | 67" (170cm) | 0 | 20/Case |
| IT1086 | HS-004-B (1)- Tip protector, (2)-spike cap, (3)-cassette, (4)-anti-free-flow clamp, (5)-0.2 micron air eliminating baby filter, (6)-slide clamp, (7)-backcheck valve, (8)-Male Luer lock adaptor, (9)-luer cap. | 67" (170cm) | 0 | 20/Case |
| IT1090 | HS-005-B (1)- Femail Luer Lock, (2)- Tip protector, (3)-spike cap, (4)-cassette, (5)-anti-free-flow clamp, (6)-0.2 micron air eliminating baby filter, (7)-slide clamp, (8)-backcheck valve, (9)-Male Luer lock adaptor, (10)-luer cap. | 67" (170cm) | 0 | 20/Case |
| IT1093 | HS-006 (1)- Tip protector, (2)-spike cap, (3)-cassette, (4)-anti-free-flow clamp, (5)-1.2 micron air eliminating baby filter, (6)-slide clamp, (7)-backcheck valve, (8)-Male Luer lock adaptor, (9)-luer cap | 90.5" (230cm) | 0 | 20/Case |

20.     Zyno has a large share of the oncology infusion pump market, selling its infusion pumps to approximately 30% of oncology practices nationwide.

## IV.  LEGAL BACKGROUND

### A.  The False Claims Act.

21.     The FCA imposes liability on any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

\* \* \*

8

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement
        material to an obligation to pay or transmit money or property to the Government,
        or knowingly conceals or knowingly and improperly avoids or decreases an
        obligation to pay or transmit money or property to the Government[.]

31 U.S.C. §§ 3729(a)(1)(A), (B) & (G).

22.     The term "knowingly" means "that a person, with respect to information
(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth
or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the
information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not
required. See 31 U.S.C. § 3729(b)(1)(B).

23.     Section 3729(a)(1) of the FCA provides that a person is liable to the
United States Government for three times the amount of damages that the Government
sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per
violation. Pursuant to the Civil Penalties Inflation Adjustment Act of 1990, as amended
by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (note), 64 Fed. Reg.
47099, 47103 (1999), and 28 C.F.R. § 85.3 (2015), the FCA civil penalties were adjusted
to $5,500 to $11,000 per violation for violations occurring on or after October 23, 1996.
In accordance with the Federal Civil Penalties Inflation Adjustment Act of 2015, those
same FCA civil penalty amounts were made applicable to all violations occurring on or
before November 2, 2015. *See* 28 C.F.R. §§ 85.3 & 85.5 (2016); 81 Fed. Reg. 42491,
42500 (2016). In accordance with the Bipartisan Budget Act of 2015, 28 U.S.C. § 2461
(note) (2015), the Department of Justice has annually adjusted the penalties applicable to
violations occurring after November 2, 2015 and assessed or enforced after August 1,
2016. As of the filing of this Complaint, the FCA civil penalty amounts have been

9

adjusted for violations occurring after November 2, 2015 and assessed or enforced after January 29, 2018 to $11,181 to $22,363 per violation. 28 C.F.R. § 85.5 (2018).

## B. Medicare Coverage for Infusion Drug Treatment.

24.     Medicare is a federal program that provides subsidized health insurance for persons who are 65 or older or are disabled. *See* 42 U.S.C. §§ 1395 *et seq.* Part A of the Medicare program provides coverage for inpatient hospital treatment. Part B of the Medicare program provides supplemental benefits to participants to cover, among other things, physician services, drugs administered by infusion or injection in physician offices and hospital outpatient departments, and certain medical equipment used in the course of covered treatment. *See generally id.* §§ 1395j–1395w-4. Part C of the Medicare program provides for Medicare Advantage plans that cover at least the benefits that are covered by Parts A and B. Part D of the Medicare program covers certain prescription drugs that are not covered under Parts A and B.

25.     Under section 1861(s)(2)(A) of the Social Security Act (the Act), Medicare will pay for administration of drugs and biologicals that are not usually self-administered by the patient furnished "incident to" a physician's professional service. "Incident to" a physician's professional services means that the services or supplies are furnished as an "integral, although incidental, part of the physician's personal, professional services in the course of diagnosis or treatment of an injury or illness." Medicare Benefit Policy Manual, Ch. 15 § 60.1.

26.     Medicare's payment for the administration of the drug or biological (such as through injection) billed to the Medicare contractor will also include payment for equipment used in furnishing the service. *See* MLN Matters Number SE 1609.

10

27. Medicare also covers certain medically necessary durable medical equipment ("DME"), such as infusion pumps, for use in patients' homes. *See* https://www.medicare.gov/coverage/infusion-pumps-supplies.

## C. Medicare Reimbursement for Infusion Drug Treatment.

28. Medicare reimbursement for infusion drug treatment is provided under different aspects of Medicare depending on the place of service where the infusion is initiated.

29. For drug infusion treatment that is initiated and terminated while a patient is under inpatient status at a hospital, claims are submitted to Medicare contractors by, and payment is made to, the hospital where the patient is treated.

30. For drug infusion treatment that is initiated and terminated at a physician's office and/or other outpatient facility such as an outpatient cancer center, Medicare pays separately for the drug and for its administration using an infusion device. These claims are submitted to Medicare contractors by, and payment is made to, the physician and/or outpatient facility providing the treatment.

31. For drug infusion treatment that is initiated at a patient's home, the infusion pump and necessary supplies are reimbursed under Medicare's DME benefit. Common HCPCS codes for these claims include E0781 (Ambulatory infusion pump, single or multiple channels, electric or battery operated, with administrative equipment, worn by patient) and A4222 (infusion supplies for external drug infusion pump, per cassette or bag). These claims are submitted to Medicare's DME contractors by, and payment is made by Medicare to, the DME company that provided the equipment.

11

32. Effective for services provided on or after January 1, 2016, Medicare reimbursed infusion of chemotherapy drugs initiated at a physician's office and continued at a patient's home under HCPCS Code G0498.[3] These claims are submitted to Medicare contractors by, and payment is made to, the physician providing the treatment.

33. Regardless of the place of service or administrative mechanism by which Medicare reimburses for drug infusion treatment, the amounts that Medicare will reimburse are calculated to include the cost of the infusion pump.

**D.  Medicare Coverage and Reimbursement for Chemotherapy Drugs.**

34. Medicare Part B covers the cost of chemotherapy drugs administered in a physician's office. The Part B reimbursement amount is generally determined by reference to the drug's Average Sales Price ("ASP"), a price which the government calculates based on quarterly price information that the drug manufacturer provides to CMS. Oncology drugs as a class account for more than half of all Medicare Part B expenditures based on the ASP reimbursement system. *See* Medpac Report to the Congress: Medicare and the Health Care Delivery System (June 2016), at p. 119 ("In 2014, Medicare spending for anticancer drugs accounted for about 55 percent of the nearly $21 billion spent on Part B drugs paid under the ASP methodology to providers in physician office and [Hospital Outpatient Department] settings and to suppliers.")

---

[3] This Code relates to "chemotherapy administration, intravenous infusion technique; initiation of infusion in the office/other outpatient setting using office/other outpatient setting pump/supplies, with continuation of the infusion in the community setting (e.g., home, domiciliary, rest home or assisted living) using a portable pump provided by the office/other outpatient setting, includes follow up office/other outpatient visit at the conclusion of the infusion."

35.     CMS has made clear the importance of ensuring that claims for reimbursement of chemotherapy drugs indicate the amount of that drug that was actually used in the treatment of the patient. *See* Publication 100-04 Medicare Claims Processing Manual, Chapter 17, Section 90.2 ("Hospitals should report charges for all drugs, biologicals, and radiopharmaceuticals, regardless of whether the items are paid separately or packaged, using the correct HCPCS codes for the items used. *It is also of great importance that hospitals billing for these products make certain that the reported units of service of the reported HCPCS code are consistent with the quantity of a drug, biological, or radiopharmaceutical that was used in the care of the patient*.") (emphasis added). *See also* Local Coverage Determination (LCD): External Infusion Pumps (L33794) ("Claims for drugs billed to Medicare must use drug dosage formulations and/or unit dose sizes that minimize wastage .... Effective for claims with dates of service on or after January 1, 2017, Medicare requires the use of the JW modifier when billing for drug wastage. Because of the HCPCS code descriptors and the associated [Units of Service ("UOS")] for [Durable Medical Equipment, Prosthetics, Orthotics & Supplies ("DMEPOS")] items, the DME MACs expect rare use of the JW modifier on claims. The amount of drug discarded must be billed on a separate claim line using the JW modifier.")

## V. FACTUAL BACKGROUND – BEFORE THE FDA AUDIT

A.     **Defendants Were Aware By 2015 That Their Infusion Administration Sets Were Defective And Leaked Critical Drugs During Treatment.**

36.     Defendants manufacture and/or distribute drug infusion pumps and administration sets. Infusion pumps are medical devices that are used to deliver drugs in controlled dosages to patients through intravenous administration sets. The types of

13

infusion pumps manufactured and distributed by Zyno are external, electromechanical IV pumps and are commonly used in the delivery of chemotherapy drugs to cancer patients.

37.     Because infusion pumps are responsible for the delivery of life-or-death medications to patients, they have been a focus of FDA's regulatory oversight. In 2010, the FDA began the Infusion Pump Improvement Initiative to engage pump manufacturers and enhance patient safety. Draft guidance issued that year and finalized by the FDA in 2014 was expressly designed to improve the quality of infusion pumps in order to reduce the number of recalls and adverse events associated with their use. *See* Infusion Pumps Total Product Life Cycle: Guidance for Industry and FDA Staff (Dec. 2, 2014), available at https://www.fda.gov/media/78369/download.

38.     The market for drug infusion pumps is highly competitive. Customers can often choose among multiple manufacturers' products to fulfill their treatment needs.

39.     Relator Warner first learned that Zyno's infusion administration sets suffered from serious defects causing leakage in 2015. At that time, Zyno purchased connector components called Luer Locks for its infusion administration sets. The Luer Locks that Zyno acquired did not fit the needleless valves on the Zyno model Primary IV pump administration sets and, as a consequence, caused drug leakage and hazardous spills from the primary and secondary administration set connection.

40.     Beginning no later than 2015, Zyno's customers and distributors lodged complaints with the company regarding the defective and leaking Primary IV administration sets. Zyno dragged its feet in responding so that it could continue to claim sales and revenue from the defective products. Only when customers insisted would Zyno replace the defective administration sets. However, providing replacement

14

administration sets was largely ineffective because the replacement products were manufactured in the same manner as the defective ones and thus had the same likelihood of malfunction as the products being replaced. Zyno failed to report that these administration sets were defective to the FDA.

41.     As one example, InfuSystem, a distributor of Zyno products, had received from Zyno over 3,000 defective IV sets (60-100 cases of 50 sets each). Steve Kim, Vice President of Operations at Zyno, first attempted to ignore the complaints and leave the defective products in InfuSystem's inventory. Only after Relator Warner and Gary Foster, Vice President of Business Development, advocated for corrective action did Zyno's owner, Dr. Chaoyoung Lee, relent and replace the defective products. Zyno did not report these defective products to the FDA.

42.     Also, in 2015, a Zyno engineer, John Barrington, personally informed Dr. Lee that Zyno's practice of fraudulently altering dates on the product change order documentation in order to avoid submitting additional regulatory documentation to the FDA was illegal. Mr. Barrington was fired by Zyno thereafter.

43.     On February 16, 2016, Mei Zhang, Vice President of Engineering at Zyno, acknowledged that specific lots of a filter sealing device used within an infusion administration set were defective. Zyno did not have enough administration sets in inventory to replace all of the defective products. Zyno did not report these defective products, which were eventually sold, to the FDA.

44.     One reason that Zyno concealed the existence and number of customer complaints is that truthful reporting would have alerted the FDA to the magnitude of the problem and, in particular, to the serious patient safety risks inherent in Zyno's defective

15

products. Ultimately, such information may well have caused the FDA to institute a forced recall which would have inflicted financial harm upon Zyno.

45.     Relators believe that the spill/leakage rate of Zyno administration sets was 25%, meaning that approximately one-quarter of all patients would have a failed IV set and not receive their required and intended medication dose.

**B.     Defendants Took Action To Conceal These Defects From Physicians, Patients, And The Government.**

46.     Federal statutes and FDA regulations mandate that infusion pump manufacturers such as Zyno notify the FDA of serious safety concerns regarding their devices via MDRs. *See e.g.,* 21 § C.F.R. 803.50 (manufacturer must submit report when it becomes aware of information that reasonably suggests that its device caused or would be likely to cause serious injury); 21 C.F.R. § 803.50(b)(2) (manufacturer must conduct investigation to evaluate the cause of each reportable event); 21 C.F.R. § 803.18 (manufacturer must maintain and allow FDA access to event files).

47.     In abdication of these responsibilities, Zyno did not have an office, department or even an individual responsible for receiving, reviewing and evaluating customer complaints as required by 21 C.F.R. § 820.198(a), and did not maintain a product investigative group to evaluate defects with their infusion pump devices as required by 21 C.F.R. § 820.100(a)(1).

48.     Zyno maintained a business relationship with a pharmacist in California, Chuck Grey. Rather than send defective products to the FDA for evaluation, Zyno would instead occasionally send them to Mr. Grey's house for evaluation. Zyno did not send Mr. Grey all defective products or notify him of all customer complaints, and Mr. Grey did not operate a full clinical laboratory that could reliably test Zyno's products.

16

49.     Zyno chose to deal with customer complaints on an individual basis, replacing defective devices with other devices only if and when a customer insisted. The clear and foreseeable consequence of Zyno's ad hoc approach was that many other customers, physicians, and patients who had not yet discovered the defects in Zyno's' devices or had not sufficiently voiced their complaints, continued to use defective products that endangered patient health. Dealing with the government, healthcare providers and patients in this deceptive manner is referred to as a "silent recall" and violates numerous federal regulations. *See* 21 C.F.R. §§ 7.40, 7.46, 7.49, 803.1, 803.10, 803.20, 803.40, 803.50, 803.53, and 806.10.

## C.     Defendants Finally Initiated A Recall In July 2016.

50.     In 2015, when he began to realize the magnitude of the defects in Zyno's pumps and their obvious potential impact on patient health, Relator Warner told VP Steve Kim that Zyno must recall the problematic administration sets. Mr. Kim rejected that proposal, responding that Zyno could not and would not do that because it would be too expensive.

51.     As the volume of customer complaints regarding Zyno's defective and leaking infusion administration sets escalated during 2016, Zyno concluded it had no choice but to finally initiate a recall. Furthermore, Zyno knew that the adulterated product had been distributed from 2013-2015. By delaying the recall until 2016, Zyno knew that the adulterated product had largely been used already so the amount of product which would need to be replaced would be correspondingly smaller.

52.     Also contributing to Zyno's decision to initiate a recall when it did was a belief among its senior leadership that the FDA would soon audit Zyno and learn on its own of the defective products.

53.     Zyno sent a letter to affected customers on July 29, 2016, titled "Filter Leaking Issue of Zyno Administration Sets from Certain Production Lots." In this letter, VP Zhang stated that it was recalling six lots of its pumps (over 318,000 administration sets) due to a "potential leaking issue. . . [that] does not impose an imminent safety concern for patients [but has] the potential for drug waste and cleanup efforts, as well as a potentially brief delay of patient treatment." Many of these sets, however, were used with hazardous chemotherapy drugs which *can* result in harm to patients and care givers if spilled upon them. Moreover, the more than 318,000 administration sets recalled were only *some* of the defective products that Zyno had manufactured and distributed to providers.

54.     The FDA recall process was not new to Zyno. Back in 2011, it had initiated a recall relating to the software that monitored accumulative fluid in one of its infusion pump products (Z-800 Volumetric Infusion System). This recall was not terminated until July 25, 2016. *See* Recall Number Z-1024-2013, FDA Website at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=116161.

## VI.    THE FDA AUDITED ZYNO AND ISSUED IT A WARNING LETTER

55.     The FDA conducted an audit of Zyno, which began with an inspection of its medical device operations at 177 Pine Street, Natick, MA, from August 3 through 11, 2016 and ended following its evaluation of Zyno's corrective actions on March 12, 2018.

56.     At the conclusion of its inspection of Zyno's operations on August 11, 2016, the FDA sent a Form 483 (List of Inspectional Observations) to Zyno to which Zyno responded by letters on August 30 and November 22, 2016.

57.     Demonstrating that issues identified in the Form 483 remained unresolved, on December 5, 2016, the FDA answered Zyno's letters via issuance of a Warning Letter to Zyno. The FDA concluded in its Warning Letter that its "inspection revealed that these devices [Zyno's infusion administration sets] are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facility or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations, Part 820."

58.     The "significant violations" identified by the FDA for which Zyno's responses were "inadequate" or otherwise required further FDA inspection included:

a.  Failure to establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit, as required by 21 C.F.R. 820.198(a).

b.  Failure to analyze processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems, as required by 21 C.F.R. 820.100(a)(1).

c.  Failure to establish and maintain procedures for validating the device design to ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions, as required by 21 C.F.R. 820.30(g).

d.  Failure to establish and maintain procedures to control product that does not conform to specified requirements, and to address the identification, documentation, evaluation, segregation and disposition of nonconforming product, as required by 21 C.F.R. 820.90(a).

e. Failure to establish and maintain procedures for acceptance activities that include inspections, tests, or other verification activities, as required by 21 C.F.R. 820.80(a).

59. The FDA Warning letter further concluded that Zyno's infusion pumps are "misbranded under Section 502(t)(2) of the Act, 21 U.S.C. § 352(t)(2), in that [Zyno] failed or refused to furnish material information regarding the devices that is required by or under Section 519 of the Act, 21 U.S.C. § 360i, and 21 CFR Part 803 – Medical Device Reporting (MDR). *Among the "significant deviations" identified were complaints relating to "air in line" that were not reported and that the FDA considered likely to cause or contribute to death or serious injury, and the specific complaint (2016V-002) from May 11, 2016 that led to the eventual recall and that Zyno similarly did not timely report to the FDA.*

60. VP Zhang stated at a Weekly Managers Meeting that the Warning Letter was issued because the FDA believed that the company did not take the audit "seriously."

61. The FDA formally completed its evaluation of Zyno's corrective actions on March 12, 2018. The Closeout Letter concludes, "This letter will not preclude any future regulatory action should violations be observed during a subsequent inspection or through other means."

## VII.   ZYNO'S FRAUDULENT ACTS DURING AND AFTER THE FDA AUDIT

### A.   Defendants Falsified Documents During The FDA Audit.

62. Zyno, like other DME manufacturers, typically relied on the "510(k) approval process" to obtain FDA approval for the marketing of its infusion pumps. The 510(k) approval process requires that manufacturers submit a new application unless they can demonstrate that a new version of a device is sufficiently similar in safety and efficacy to a previously-approved device. *See* 21 § C.F.R. § 807.81(a)(3). The FDA has

20

stated that it "expects that most changes or modifications to infusion pumps could significantly affect the safety or effectiveness of the devices and would therefore require submission of a new 510(k)." Infusion Pumps Total Product Life Cycle: Guidance for Industry and FDA Staff, at p. 9, n.5 (Dec. 2, 2014). Devices that require submission of a new 510(k) application may not be commercially distributed prior to FDA approval of the new application. 21 C.F.R. § 807.100(a).

63.     During the course of the FDA's audit of Zyno, Relator Warner learned that VP Zhang was backdating product revision orders from the September/October 2016 period. These related to the versions of the software included in various versions of infusion pumps. The goal in backdating was to avoid having to submit a new 510(k) application to the FDA.

64.     By fraudulently backdating documents identifying when certain material changes were made to the Zyno pumps, the company concealed from the FDA the material facts that these changes were new, meaning they were made *after* the FDA had approved the pumps. This backdating concealed the highly troubling facts that: 1) there existed a serious problem with the functionality of the pumps as approved under the original 510(k) application; 2) Zyno knew of that problem and as a consequence changes had been made to the pumps; and 3) those changes had never been reviewed by the FDA for safety or effectiveness and never received FDA approval. In short, this deceit was intended to, and successfully did, undermine the ability of the FDA to oversee Zyno's design, manufacture and distribution of its medical devices, devices being used in the administration of critical drugs to patients.

65.     Neither the FDA audit nor its December 5, 2016 Warning Letter

mentioned the backdating of documents relating to software changes in Zyno pumps.

Nor could they have, since the FDA was and remains unaware of Zyno's fraudulent acts

in this regard.

**B.     Defendants Continue To Manufacture And Distribute Defective Infusion Pumps and Administration Sets, Including Nimbus Pumps And Sets, And Have Created New Corporate Entities As A Shield Against Liability.**

66.     Zyno's strategy to evade liability and regulatory enforcement also

included creating new corporate entities in an attempt to segregate the regulated business

operations from those which are non-regulated.  On the advice of its regulatory

consultant, Zyno created a constellation of affiliated companies to separate the

manufacture of its products from their marketing and distribution. However, this change

in corporate configuration was on paper only. All affiliated companies operated with the

same management, employees, and physical assets, and all were run from Zyno's

corporate headquarters in Massachusetts.

67.     In September 2016, VP Zhang announced at a meeting that manufacture of

the Nimbus product was being "transferred" to another affiliated company, InfuTronix,

LLC. This transfer was made so that future legal or regulatory problems with the Nimbus

product would not affect Zyno Medical, LLC, a statement that was made multiple times

by Dr. Lee. Indeed, one problem at the time as between Zyno Medical, LLC, and Zyno

Electric & Machinery, Ltd., unacknowledged publicly by Zyno, was ongoing concerns

with flow rate inaccuracies in the pumps and administration sets. In mid-2016, Relator

Warner was told by Zyno's Safety Engineer Wagner Cruz that "China calls the shots.

When receiving product revisions from China, they did not match the product revisions at Zyno Medical USA."

68.     Nine months later, in or around June 2017, Dr. Lee announced that Zyno was going to substantially reorganize its corporate structure. The reorganization concept was simple – because the FDA regulated the manufacture of the infusion pumps, but not Zyno's sales, marketing, or distribution operations, these functions would be "spun off" to new corporate entities. The clear intent of this reorganization was not to achieve any legitimate business purpose but instead was to quarantine certain business operations to frustrate and avoid regulatory enforcement. In fact, when VP Foster raised concerns about this approach to Dr. Lee on multiple occasions, Dr. Lee responded in defense of the strategy that it would insulate certain company functions from FDA regulation. Dr. Lee knew, however, that this so-called reorganization of the corporate structure had no impact whatsoever upon the actual operations of the business; the various new inter-related companies continued to use the same personnel and physical assets and operated out of the same location as Zyno had prior thereto.

69.     Accordingly, beginning in 2017 and continuing into 2018, the sales, marketing, and clinical operations of Zyno Medical LLC were transferred to Zyno Solutions, LLC. Similarly, the sales and marketing operations of InfuTronix were transferred to InfuTronix Solutions, LLC.

70.     Dr. Lee told a group of top Zyno management, including Relator Bertucci, that his purpose in creating Zyno Solutions as a distribution company was to have a distinct corporate entity which would collect product complaints and keep them separate from the corporate entity engaged in the manufacture of the product.

23

71.     Indeed, on July 20, 2018, Steve Kim, then Vice President of Operations of both Zyno Solutions, LLC, and InfuTronix Solutions, LLC, sent an email to Zyno's sales team and others making this unlawful purpose plain. His email directed that all communications related to customer "feedback" he directed to a new Zyno Solutions email address where they would be reviewed prior to a determination of whether or not they should be reported to Zyno Medical, LLC. To avoid any confusion, Mr. Kim's directive continued:

*Please do NOT directly contact or send group emails to Peter Nikki or Jingran Li or Mei Zhang who handles the complaints on behalf of InfuTronix LLC and Zyno Medical LLC.* **If they received any customers' dissatisfactory feedback, they have to register as complaints which require unnecessary follow ups and those follow ups are subject to scrutiny of the regulatory body.** (Emphasis added.)

72.     This filtering process enabled Zyno to selectively insulate Zyno Medical LLC (and the FDA) from customer complaints. For example, a product leak was reported by a representative from Skilled Nursing Pharmacy, who advised Zyno that all samples tested in March 2018 "failed the testing since leaks were identified at the filter of the set." The correspondence with this customer was handled by Zyno Solutions LLC, which thanked the customer for reporting the incident to "Zyno Medical." Zyno Solutions's response to the customer stated that it was not making any change to its assembly process because "only one filter lot was rejected."

73.     In the course of discussing the FDA's audit with Relator Wagner, Zyno Safety Engineer Wagner Cruz stated that the company would be in "big trouble" if the FDA "asked the right questions." Currently, customer complaints are being discarded if no verification occurred (verification means the IV set was returned and a resolution was made to stay within the ISO AQL (accepted quality level)) in an effort to avoid FDA

scrutiny and recalls. This current practice, which happens routinely, has been acknowledged by Zyno Service Manager Stephen Reading and Safety Engineer Wagner Cruz. Documentation substantiating this fraudulent practice exists also.

74. The company policy had been that after three complaints arising from within a given administration set lot number, that lot would be quarantined. By deliberately turning a blind eye and choosing not to validate and record the complaints, Zyno avoided quarantining many lots containing defective administration sets.

## C. Specific Providers To Which Zyno Sold Defective Infusion Pumps and Administrations Sets.

75. The following paragraphs provide information about specific providers that used and billed for services regarding defective Zyno pumps.

a. The US Oncology Network — Texas-based, one of the largest networks of community-based oncology physicians in the nation: Zyno lied to this provider about "air-in-line" problems with the first-generation Zyno pump. An executive from this provider told Relator Warner that he did not think he could do business with Zyno because Dr. Lee had lied to him about the problems with that device which were putting patients in harm's way.

b. Alabama Oncology (Birmingham, AL): This practice experienced leakage with Nimbus Flex tubing and inaccuracy of Nimbus Pump infusions. In July 2018, the Zyno devices used by Alabama Oncology leaked chemotherapy drugs onto several patients. Zyno took possession of the defective products and sent them to Mr. Grey in California but did not otherwise report these incidents and instead simply replaced the devices even though Carrie Evans, Business Development-Southeast, stated that she and others believed the defective lot numbers should be withdrawn not only from Alabama Oncology but also from other customers. Ms. Evans apologized to Alabama Oncology for "any inconvenience or patient concern" caused by the product defects and invited its staff to dinner later that week.

Alabama Oncology told Relator Bertucci and Mr. Grey that when the administration sets leaked during infusion, the patients were not given replacement drugs and the provider billed Medicare as though a complete dose had been administered ($12-15,000 per dose).

c. Florida Cancer Specialists (Fort Myers, FL): It was known at Zyno that many infusion pump sets used by Florida Cancer Specialists were defective and that

leaking sets were discarded and replaced without testing that would have identified the specific defect. Florida Cancer Specialists is the largest cancer treatment provider in the country.

d. The Christ Hospital Health Network (Cincinnati, Ohio): Many Nimbus Flex pumps leaked during a trial at this provider during the summer of 2018. This was known specifically by Steve Dethy, who was the Zyno salesman for that region. Relator Bertucci believes that this provider continues to bill for the full treatment even when Nimbus pump defects do not allow for delivery of the required dose of medication to patients.

e. Bone Marrow of Houston: Zyno's Nimbus Flex infusion pumps and administration sets leaked at this provider. This was made known specifically to Mike Stanley, Regional Account Manager. Patients were not given a replacement drug after leakage to enable them to receive a full dose, yet this provider billed Medicare as though a full dose had been administered.

f. Utah Cancer Specialists (Salt Lake City, Utah): Zyno made sure that defective products from this customer were discarded so that there would be no audit trail. This was known specifically to Zyno's Regional Account Manager Damian Head.

g. Vernon Internal Medicine & Oncology Clinic (Leesville, LA): This provider reported numerous leaks from Zyno pumps, which Zyno concealed from the FDA.

h. Valley Medical Oncology Consultants (Pleasanton, CA): This provider made many complaints regarding spillage and leaking tubing and resultant dosing inaccuracy issues with Nimbus pumps. This was known specifically to Mr. Head. Zyno took no corrective action with respect to this provider.

i. Lake Health University Hospital Seidman Cancer Center (Mentor, Ohio): This provider sent a complaint letter to the FDA concerning constant leaks with the Nimbus pump and administration sets. The distributor for this provider is Oncology Supply (owned by Amerisource Bergen) and its representative is John Misitis. Oncology Supply was upset with Zyno for not recalling these defective products and allowing them to remain in Oncology Supply's warehouse. In early to mid-2019, Zyno sent a letter to Oncology Supply advising them to use the "enhanced Nimbus administration sets" while not advising them what to do with the old adulterated Nimbus administration sets. This decision to remain silent as to the old administration sets conveniently enabled Zyno to avoid a recall.

## D. Defendants' Fraud Has Caused the Submission Of False Claims To Medicare.

76.     In addition to causing the submission of false claims by manufacturing,

marketing and distributing what it knew to be defective products and engaging in

26

multiple unlawful tactics to conceal from the FDA and CMS these unlawful and unsafe products and practices. Zyno intentionally and specifically marketed its products by highlighting for customers the increased profits they would make from Medicare reimbursement for the use of its devices when compared with reimbursement rates for competitors' IV infusion devices.

77. Zyno developed spreadsheets that compared the profit that practices would make purchasing its pumps and billing infusion therapy to Medicare relative to the profit it would make renting pumps from another company.

78. In this manner, Zyno leveraged Medicare reimbursement to finance providers' purchases of its knowingly defective infusion pumps.

79. False claims submitted to Medicare as a result of Defendants' scheme include the following Current Procedural Terminology (CPT) Codes:

**96416** – Chemotherapy administration, intravenous infusion technique; initiation of prolonged chemotherapy infusion (>8 hours), requiring use of a portable or implantable pump.

**96425** – Chemotherapy administration, intra-arterial; infusion technique, initiation of prolonged infusion (>8 hours), requiring the use of a portable or implantable pump.

**96521** – Refilling and maintenance of portable pump.

**96522** – Refilling and maintenance of implantable pump or reservoir for drug delivery, systemic.

**E0779** – Ambulatory infusion pump, mechanical, reusable; for infusion of 8 hours or greater.

**E0781** – Ambulatory infusion pump, single or multiple channels, electric or battery operated with administrative equipment; worn by patient.

**E0782** – Infusion pump, implantable, nonprogrammable (includes all components).

**E0783** – Infusion pump system, implantable, programmable (includes all components).

**E0791** – Parenteral infusion pump, stationary, single or multichannel.

**E0776** – Intravenous (IV) pole (covered only when a stationary pump is covered).

**A4221** – Supplies for maintenance of drug infusion catheter; per week.

27

**A4222** – Infusion supplies for external drug infusion pump; per cassette or bag.

**G0498** – Chemotherapy administration, intravenous infusion technique; initiation of infusion in the office/other outpatient setting using office/other outpatient setting pump/supplies, with continuation of the infusion in the community setting (e.g., home domiciliary, rest home or assisted living) using a portable pump provided by the office/other outpatient setting, includes follow up office/other outpatient visit at the conclusion of the infusion

**J9190** – Injection, fluorouracil (5-FU), 500mg

**J1745** – Remicade, 10mg

**J9267** – Paclitaxel, 6mg

80.     Medicare reimbursement for a single day's treatment on a single patient of chemotherapy drug infusion using a Zyno pump can reach approximately $20,000.

## VIII.  COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

81.     Relators re-allege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

82.     By virtue of the acts described above, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

83.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

### Count II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

84.     Relators re-allege and incorporate each allegation in paragraphs 1 through 80 as if fully set forth herein and further allege as follows:

28

85.     By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

86.     The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## Count III
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(G)

87.     Relators re-allege and incorporate each allegation in paragraphs 1 through 80 as if fully set forth herein and further allege as follows:

88.     By virtue of the acts described above, Defendants have "knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit" money to the United States in violation of 31 U.S.C. § 3729(a)(1)(G).

## PRAYER FOR RELIEF

**WHEREFORE**, Relators demand that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes three times the amount of damages to the United States plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim before or on November 2, 2015, and civil penalties of no more than $22,363 and no less than $11,181 for each violation after November 2, 2015, and any other recoveries or relief provided for under the FCA.

Further, Relators request that they receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative

remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relators request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

DATED: February 26, 2020

Respectfully submitted,

SHAPIRO & TEITELBAUM

By: _____

Jonathan Shapiro
90 Canal Street, Suite 120
Boston, MA 02116
(617) 742-5800
jshapiro@jsmtlegal.com

Sherif K. Sakla, M.D., J.D.
Stephanie C. Reuther
THE SAKLA LAW FIRM, APLC
1100 Poydras Street, Suite 2905
New Orleans, LA 70163
(504) 528-1800
ssakla@lawmedic.com
sreuther@lawmedic.com

COHEN MILSTEIN SELLERS & TOLL
PLLC
Jeanne A. Markey
Gary L. Azorsky
Raymond M. Sarola
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(267) 479-5700
jmarkey@cohenmilstein.com
gazorsky@cohenmilstein.com
rsarola@cohenmilstein.com
*Counsel for Relators*

30

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a copy of the above Complaint to be served on the following counsel by mail:

The Honorable William P. Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

The Honorable Andrew E. Lelling
United States Attorney
District of Massachusetts
John Joseph Moakley
United States Federal Courthouse
1 Courthouse Way, Suite 9200
Boston. MA 02210

DATED: February 26, 2020

Jonathan Shapiro